Jason Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
J. Thomas Brett (Bar No. 315820)
Email: jtb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Phone: (916) 202-3018

Barak J. Kamelgard (Bar No. 298822)
Email: Barak@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E. 2nd Street Suite 250
Los Angeles, CA  90012
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>KELTERITE CORPORATION, a California corporation; KELTERITE COMPANY, LLC, a California corporation,<br><br><br>Defendants. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

I.    **JURISDICTION AND VENUE**

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On January 12, 2024, LA Waterkeeper issued a 60-day notice letter ("Notice Letter"), to the registered agent for service of process (40 C.F.R. § 135.2(a)(2)) Kelterite Corporation and Kelterite Company, LLC (hereafter "Kelterite" or "Defendants"), and the Chief Executive Officers of Kelterite Corporation and Kelterite Company, LLC, Shawn A. Smith, and John A. Smith, respectively, individually and as the Owners/Operators of the Facility under its control.

3.    The Notice Letter informed Defendants of their violations of California's Storm Water Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No*. 2014-0057-DWQ) and amended by Order No. 2015-0122-DWQ and incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Loads ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (hereafter the "Storm Water Permit") and the Clean Water Act at the industrial facility located across the following multiple contiguous properties / addresses: 12231 Pangborn, Ave., 12328, 12320, 12314, and 12240 Woodruff Ave., and 9756 and 9782 Seaaca Street, Downey, CA 90241 with Waste Discharger Identification Number ("WDID") 4 19I022159 (hereafter, the "Facility").

4.     The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

5.     The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

6.     More than sixty (60) days have passed since both the Notice Letter was served on the Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

7.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

8.     Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.     <u>INTRODUCTION</u>

9.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These

surface waters, known as receiving waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that those surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the receiving waters.

10.    High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

11.    This complaint seeks a declaratory judgment, injunctive relief, the

Complaint for Declaratory and Injunctive    4
and Civil Penalties Relief

imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendants' operations at the Facility.[1]

12.     Plaintiff specifically alleges violations regarding Defendants' discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.  **PARTIES**

### A.  **Los Angeles Waterkeeper**

13.     LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper maintains an office at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

14.     LA Waterkeeper's members live and/or recreate in and around Los Angeles area. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters, including but not limited to, the San Gabriel River, the San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and the Pacific Ocean. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

15.     LA Waterkeeper members work and reside in Los Angeles County, and they use and enjoy the San Gabriel River, the San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and the Pacific Ocean, (collectively the "Receiving Waters"), as well as the bordering parks, pathways, and golf courses, athletic fields, and beaches.

16.     Defendants' discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Receiving Waters,

---

[1] The Facility is fully described in Section V below.

Complaint for Declaratory and Injunctive     5
and Civil Penalties Relief

including the San Gabriel River, and impair LA Waterkeeper's members use and enjoyment of those waters.

17. Kelterite discharges pollutants into the Receiving Waters in violation of the Clean Water Act and the Storm Water Permit. LA Waterkeeper members also use and enjoy the Receiving Waters and other connected waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run, fish, surf, swim, sail, and recreate. Additionally, LA Waterkeeper members use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs LA Waterkeeper's members' use and enjoyment of these waters. The unlawful discharge of pollutants from the Facility requires LA Waterkeeper to expend its limited resources to study and combat pollution from the Facility. Thus, the interests of LA Waterkeeper and its members have been, are being, and will continue to be adversely affected by Kelterite's failure to comply with the Clean Water Act and the General Permit.

18. The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendants' discharge of polluted storm water from the Facility. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

19. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

20. The interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendant's activities.

**B.  The Owners/Operators of the Facility**

21. Plaintiff is informed and believes, and thereon alleges, that Defendant

Kelterite Corporation is an active California corporation with a principal place of business at 12231 Pangborn Ave., Downey, CA 90241.

22.     Plaintiff is informed and believes, and thereon alleges, that Defendant Kelterite Company, LLC is an active California corporation with a principal place of business at 12240 Pangborn Ave., Downey, CA 90241.

23.     Plaintiff is informed and believes, and thereon alleges, that Kelterite Corporation and/or Kelterite Company, LLC is/are the owner and/or operator of the Facility.

24.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Kelterite Corporation is Shawn A. Smith, 12231 Pangborn Ave., Downey, CA 90241.

25.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Kelterite Company, LLC is John A. Smith, 12240 Pangborn Ave., Downey, CA 90241.

26.     LA Waterkeeper refers to Defendants Kelterite Corporation, Kelterite Company, LLC, and its management herein as the "Owners/Operators" of the Facility.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act

27.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to

dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

29.     Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

30.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a) and 1342.; *see* 40 C.F.R. § 122.26(c)(1).

31.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

32.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

33.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

34.     "Navigable waters" means "Waters of the United States." 33 U.S.C. § 1362(7); 33 CFR § 328.3.

35.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an

"effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

36.     The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

38.     Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after December 20, 2015 commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects Kelterite to a penalty of up to $64,618 per day per violation.

39.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

40.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

41.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code §

13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

42.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

43.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

44.     On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ*. Storm Water Permit, Section I(A) (Finding 4).

45.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

46.     On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

47.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its

terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I.A (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I.A (Finding 17), Section II.B.

### C.   The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

48.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

49.    Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

50.    Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

51.    Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Section V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final

National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52.    The 2015 Multi-Sector Permit parameter Benchmarks, among others, are as follows: TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L; cadmium—0.0021 mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0 mg/L; pH—6.0-9.0 s.u.; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—0.47 mg/L; selenium—0.005 mg/L; and silver—0.0032 mg/L.[2]

53.    The EPA's most recent, 2021 Multi-Sector Permit parameter Benchmarks for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; lead—0.082 mg/L; cadmium—0.0018 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u.; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; nickel—0.47 mg/L; selenium—0.0031 mg/L; and silver—0.0032 mg/L.

54.    The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. *See* Storm Water Permit, Section I(M)(Finding 62).  Annual NALs, not accounting for water hardness, for the following parameters are: TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; cadmium—0.0053 mg/L;  N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—1.02 mg/L; selenium—0.005 mg/L; and silver—

---

[2] The 2015 and 2021 Multi-Sector Permit parameter Benchmarks for cadmium, nickel, silver, and zinc are dependent on water hardness where discharged into freshwater. The benchmark value listed herein is based on a hardness of 100 mg/L.

0.0183 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. *Id*.

55. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Stormwater Permit Section XII.A.

56. Receiving Water Limitation Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

57. Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

58. Receiving Water Limitation Section VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

59. Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

60. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

61. The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water

quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-44. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-29.

62. The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the San Gabriel River and its watershed.

63. The Basin Plan specifies potential and existing beneficial uses for the San Gabriel River including municipal and domestic supply, industrial process and service supply, warm freshwater habitat, wildlife habitat, and habitat for rare, threatened, or endangered species. Basin Plan, Table 2-1. The Basin Plan further specifies beneficial uses for the San Gabriel River Estuary. *Id*.

64. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

65. Reach 2 of the San Gabriel River, into which the Facility discharges, is impaired for lead, cyanide, and temperature. It has been proposed in the Draft California 2024 Integrated Report that Reach 2 will also be listed as impaired for aluminum and indicator bacteria.

66. Reach 1 of the San Gabriel River is impaired for pH and temperature. It has been proposed in the Draft California 2024 Integrated Report that Reach 1 will also be listed as impaired for DDT, O&G, and indicator bacteria. The San Gabriel River Estuary is also listed for impairments on the Section 303(d) list; specifically, copper, dioxin, indicator bacteria, nickel, and dissolved oxygen, and it has been proposed in the Draft California 2024 Integrated Report that they will also be listed as impaired for chlordane, chlorine, temperature, and toxicity. The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the

receiving waters' beneficial uses.

67.    The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the Receiving Waters' beneficial uses.

68.    In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 40 C.F.R. § 131.38. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as, 0.065 mg/L for lead, 0.013 mg/L for copper, 0.022 mg/L for cyanide, 0.47 mg/L for nickel, and 0.12 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L. [3]

69.    The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

70.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. *See* Storm Water Permit, Section VI(A).

**D.    The Storm Water Permit's Numeric Effluent Limitations**

71.    Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the San Gabriel River include metals and selenium. Storm Water Permit, Attachment E,

---

[3] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

Complaint for Declaratory and Injunctive    15
and Civil Penalties Relief

Table E-1. Discharges from the Facility are subject to the San Gabriel River TMDL requirements for metals, which include the following NELs: lead—0.166 mg/L. Storm Water Permit, Attachment E, Table E-2.

72.     An exceedance of an NEL constitutes a violation of the General Permit. General Permit, Attachment C at 5. An NEL exceedance occurs when two (2) of more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. *Id*.

### E.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements

73.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54) and X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Sections I(D) (Finding 32) and X(C).

74.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description

of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

75.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

76.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

77.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm

Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

**F.   The Storm Water Permit's Monitoring Implementation Program Requirements**

78.   The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)–(D). The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

79.   Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

80.   The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

81.   The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55–56) and XI.

82.   Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

83.   Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

84. Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

85. The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit, Section XI(B)(4).

86. Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

87. Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

88. Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

89. All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification ("SIC")

Codes: 1429 (Crushed and Broken Rock, Not Elsewhere Classified); 2951 (Asphalt Paving Mixtures and Blocks); and 5211 (Lumber and other building materials dealer). Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6) When self-reporting storm water sample results, Defendant samples for those pollutants listed above in this paragraph.

90.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

### G.     Exceedance Response Action Requirements

91.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

92.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit Section XII(C)(1)(a)-(c).

93. Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

94. Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

95. The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

96. A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* Storm Water Permit, Section XII(C)(2)(b).

97. A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* Storm Water Permit, Section XII(D).

98. A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of

the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, Storm Water Permit, Section XII(D).

## V.        STATEMENT OF FACTS

### A.        Kelterite Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility

99.     Defendant operates an industrial facility located across the following multiple contiguous properties / addresses: 12231 Pangborn, Ave., 12328, 12320, 12314, and 12240 Woodruff Ave., and 9756 and 9782 Seaaca Street, Downey, CA 90241.

100.    The Facility's SWPPP, last updated in June 2015, ("Facility SWPPP"), states that the Facility is approximately 14.5 acres. The SWPPP also indicates 10.2 acres at the Facility are impervious and 12.1 acres of industrial activities at the Facility are directly exposed to precipitation and storm water runoff. The Facility's operating hours are Monday through Friday from 7 AM to 4 PM.

101.    Per the Facility SWPPP, the Facility is comprised of six parcels with six addresses, forming one contiguous facility. The parcel with the address 12240 Woodruff Avenue is an existing office and equipment maintenance facility, including a fuel island with two diesel Underground Storage Tanks, an above ground TAC tank, an above ground diesel fueling tank, a waste oil tank, and a motor oil tank. The parcel with the address 12231 Pangborn Ave. is the site of an asphalt plant. The building located at 9756 Seaaca Street is used to store equipment and building materials. The parcel(s) with the addresses 12320 and 12328 Woodruff Avenue, and 9782 Seaaca Street, are used to stockpile recycled asphalt, dirt, broken and cold mix concrete and base material. An existing building is used to store small amounts of paint and similar materials. A stationary crusher operates on-site to crunch stockpiled materials. Additionally, there are times when a portable crusher might be brought on site to perform similar activities.

102.    According to the Facility SWPPP there are eight major buildings present at the Facility. Three buildings, identified as Buildings A, B, and I, are used primarily as

office buildings and occupy a total of about 12,356 square feet; two of these building are located on the north side of the site near the entrance off of Woodruff Avenue, while the third office is near the intersection of Seaaca street and Pangborn Avenue. On the south-central portion of the site are two large buildings; the southernmost building (Building C) covers approximately 9,250 square feet and is used for heavy equipment repair; to the north, Building D occupies 7,042 square feet and is used for the maintenance of heavy equipment. Both buildings are used for parts storage. Building E, covering approximately 2,600 square feet, is a test room for the batch plant. Finally, Buildings F, G, and H occupy about 67,720 square feet and are mostly empty with some material and equipment storage. A small portion of Building F on the south end is used for rock crushing.

103.    The Facility primarily engages in the production and sale of asphalt and accepts used asphalt and concrete.

104.    The Facility SWPPP identifies the following areas of industrial activities at the Facility: vehicle fueling incoming / outgoing traffic at the northern end of the Facility, the east side of "Building B", and maintenance shops; vehicle and equipment repair and maintenance, fluids draining, parts washing, parts storage, vehicle storage, incoming / outgoing traffic, battery removal and battery storage at the Maintenance Shop, Buildings C and D, and the eastern portion of Building B; automobile maintenance, fluids draining, parts washing parts storage, vehicle storage, and incoming / outgoing traffic at the Maintenance Shop / Bus Garage Area; Grinding of used Asphalt at the South Side of Building F, Grinding Area; and the Production of asphalt at the Asphalt loading area.

105.    Based on its investigation and review of the Facility SWPPP and Site Map(s), furthermore, LA Waterkeeper is informed and believes that Kelterite maintains large, uncovered, stockpiles containing asphalt materials.

106.    Pollutants of concern from the industrial areas and activities described in the previous paragraph include, but are not limited to, O&G, pH, TSS, N+N, iron, zinc, aluminum, and lead. These pollutants are subject to tracking to other areas of the Facility, and offsite of the Facility, by employees, transfer of industrial materials between work

areas and warehouses, loading and unloading of industrial materials, vehicle and forklift traffic, and use of heavy industrial equipment. These areas of industrial activity generate and release pollutants at the Facility which are discharged in storm water, including O&G, pH, TSS, N+N, iron, zinc, aluminum, and lead.

107. Metal shavings, chips, dust and particulates, and/or chemical sediment from the industrial activities at the Facility can accumulate around the Facility. Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water.

108. As outlined in the Facility SWPPP, there are four Drainage Areas ("DA") at the Facility, DA-1 through DA-4. LA Waterkeeper is informed and believes that storm water and non-storm water discharges from these drainages areas all ultimately discharge to the San Gabriel River, which is located directly adjacent to the Facility.

109. Though not attached to the Facility SWPPP, Kelterite submitted a Facility Map via SMARTS on June 30, 2015.

110. The Facility Map identifies five Sampling Areas ("SA"), SA1 to SA5. Of the five SAs demarcated on the Facility Map, the Facility SWPPP identifies four (SA1 to SA4) as "Discharge / Outfall Locations." Facility SWPPP at 23.

111. SA1 is an inlet drain located near the southwest corner of the "covered storage" building designated as Building F on the Facility Map; water entering this inlet flows to San Gabriel River. *Id*; and Facility Map.

112. SA2 is an inlet drain located immediately to the south of the entrance of the Facility at the intersection of Pangborn Ave and Seaaca St; water entering this inlet ultimately flows to the San Gabriel River. *Id.*; Facility Map.

113. SA3 is an elevated inlet drain located along the southern boundary of the Facility and just to the west of the southeast corner of the Facility; SA3 collects flows during large rain events and discharges to the San Gabriel River. *Id.* at 4-5, and 23.

114. Finally, SA4 is comprised of two outfall locations located within and/or on the banks of the San Gabriel River directly adjacent to the Facility. *Id.* at 23; Facility Map.

115.   DA-1 is located on the northwest corner of the site; flow from DA-1 is sheet flow to Woodruff Road. Facility SWPPP at 4-5. LA Waterkeeper is informed and believes that this sheet flow enters the municipal separate storm water sewer system ("MS4"), which in turn discharges to the San Gabriel River. According to the Facility SWPPP, no industrial activities occur within DA-1. Facility SWPPP at 4-5.

116.   DA-2 flows from the northern portion of the site and combines with street flow from Pangborn Ave and Seaaca Street. Facility SWPPP at 4-5. This flow continues form north to south in a "v ditch", straight through the site for several hundred feet until it enters an inlet drain near the southwest corner (SA1) of building F. *Id.* Additional sheet flow from the northern portion of the site collects in a second "v ditch" that flows from west to east and merges with the above inlet drain. *Id.* This storm water is piped underground and is discharged into an outfall into San Gabriel River. *Id.*

117.   DA-3 covers the southern portion of the site. *Id.* Flow is directed to the southeast corner where it enters an infiltration area. *Id.* According to the Facility SWPPP, during large rain falls, the area ponds and flows into an elevated inlet (SA3), which flows directly to the San Gabriel River. *Id.* Two other small inlets are located on the west side of Building C and Building D. These inlets are connected and flow to the infiltration area. *Id.*

118.   LA Waterkeeper is informed and believes that the elevated inlet at (SA3), which once existed as described in the Facility SWPPP, is now buried under a large material storage pile.

119.   DA-3 is equipped with a "Cultec Storm Water Charger" (hereafter the "Charger"); the Charger is designed to capture and retain the first 0.75 inches of rain that falls on the surface area of the asphalt plan within DA-3. *Id.*

120.   DA-4 picks up sheet flow and discharges to the inlet drain located at SA2; this drain combines underground piping from DA-2 before discharging into the San Gabriel River. *Id.* DA-2 and DA-3 both contribute sheet flow to SA4 via piped connections with SA1 and SA3.  which is located at an outfall directly to the San Gabriel

River. Facility SWPPP at 24; Facility Map.

121.   In addition to the described pathways above, the Facility Map also shows that areas of DA2 also flow to SA5. The SWPPP does not describe the fate of storm water entering SA5 and does not list SA5 as "Discharge / Outfall Locations."

122.   Per the Facility SWPPP, the Facility has implemented the following advanced BMPs: shelters and/or roofed awnings over industrial activities occurring in Buildings B-D, and Building F; oil absorbent booms / oil absorbents at "inlet structure leading to Outfall A, B, and C"[4], bus garage area and parking lot, and the Southeast corner in DA-3; and the Cultec Storm water Charger (infiltration system) located at the southeast corner in DA-3.

123.   The San Gabriel River, the San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and the Pacific Ocean are waters of the United States, and which, upon information and belief, receive stormwater discharges from the Facility.

**B.     The Facility Storm Water Permit Coverage**

124.   SMARTS lists the current Facility WDID number for the Facility as 4 19I022159 and coverage under the Storm Water Permit as "Active."

125.   The NOI for the Facility lists the Receiving Water as San Gabriel River Reach 1. Plaintiff is informed and believes, however, that the Facility discharges to Reach 2 of the San Gabriel River.

126.   Via search of the SMARTS database, Plaintiff obtained the Facility SWPPP for the Facility, last revised in June 2015.

127.   Plaintiff is informed and believes, and thereon alleges, that Kelterite has been operating with an inadequately developed or implemented SWPPP in violation of Storm Water Permit requirements since at least January 12, 2019. Kelterite has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

---

[4] It is not clear what Outfalls the SWPPP is referring to here, as this is the only time any outfalls are referred to with these alphabetic designations.

128.   The Facility SWPPP also fails to describe dust generating activities at the Facility – again in violation General Permit Section X.A – despite the fact that, as described in greater detail below, Kelterite's industrial operations produce significant amounts of dust and particulate pollution.

129.   LA Waterkeeper is also informed and believes that the Facility SWPPP fails to adequately describe or assess potential pollutant sources at the Facility as required. General Permit Section X.A. Specifically, LA Waterkeeper's investigation of the Facility indicates that industrial sources of iron and aluminum are present at the Facility and that these pollutants are discharged in storm water and non-storm water runoff from the Facility. LA Waterkeeper is further informed and believes that the discharges of these additional pollutants are in excess of applicable effluent limitations. Yet, the Facility SWPPP fails to describe or assess these pollutant sources as required. General Permit Section X.A & X.G.1-2.

130.   Defendants entered into ERA Level 1 for pH during the 2021-2022 reporting year. Yet, Defendants did not submit a Level 1 ERA report until March 2023. Defendants, moreover, have failed to update the Facility SWPPP to reflect the changes to the Facility and BMP improvements prescribed by the Level 1 ERA report; this violates of Section XII.C.2 of the General Permit, which requires that the Facility SWPPP be updated to reflect additional BMPs to be implemented pursuant to the Level 1 ERA report.

131.   LA Waterkeeper is informed and believes that the Facility accepts waste concrete for disposal and/or recycling; indeed, the Kelterite website indicates that it accepts concrete and provides rates for that service.[5] Yet, the Facility SWPPP fails to describe areas where concrete is accepted and/or stored, or assess and describe potential pollutants associated with those activities in violation of the General Permit. *Id.* at Section X.A.

---

[5] *See* https://www.kelterite.com/asphalt-pricing for pricing for "clean concrete dump"; see also https://www.kelterite.com/ which states that the Facility accepts "concrete."

132.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the Storm Water Permit. As such, the Owners/Operators are in daily violation of this requirement of the Storm Water Permit.

133.   Plaintiff is informed and believes, and thereon alleges, that Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

134.   Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: O&G, TSS, COD, pH, N+N, lead, iron, zinc, and aluminum.

135.   Plaintiff is informed and believes, and thereon alleges, that Kelterite has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Storm Water Permit, Sections X(H)(1)(a)–(g).

136.   Plaintiff is informed and believes, and thereon alleges, that Kelterite has further failed to implement sufficient advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations. Storm Water Permit, Section X(H)(2).

137.   Plaintiff is informed and believes, and thereon alleges, that there are also insufficient minimum BMPs implemented, such as good housekeeping.

138.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least January 12, 2019.

139.   Plaintiff is informed and believes, and thereon alleges, that storm water

discharges containing excess levels of TSS, COD, pH, N+N, lead, iron, zinc, and aluminum occur each time storm water discharges from the Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

140.   Plaintiff is informed and believes, and thereon alleges, that Defendant's repeated and significant exceedances of NALs and Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

141.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators discharges pollutants in excess of applicable NAL and Benchmark Levels, including but not limited to, iron and aluminum; the Owners/Operators, however, have and continue to fail to sample for these, and other parameters, due to the Facility SWPPP's inadequate pollutant sources assessment described above.

142.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

143.   Plaintiff is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

144.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from the Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

145.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from the Facility into the Receiving Waters.

### C.   Storm Water Discharges from the Facility

146.   As discussed above there are four Drainage Areas ("DA") at the Facility, DA-1 through DA-4. LA Waterkeeper is informed and believes that storm water and non-storm water discharges from these drainages areas all ultimately discharge to the San Gabriel River, which is located directly adjacent to the Facility.

147.   Plaintiff is informed and believes, and thereon alleges, that Kelterite has self-reported NAL exceedances from the Facility during three of the past five (5) reporting years.

### D.   The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants

148.   Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge with storm water to the San Gabriel River, the San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and ultimately to the Pacific Ocean.

149.   Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge with storm water to the San Gabriel River, the San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and ultimately to the Pacific Ocean.

150.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows to the San Gabriel River, the San Gabriel River Estuary, Alamitos Bay, San Pedro Bay, and the Pacific Ocean, all waters of the United States.

151.   Storm water discharges containing pollutants including, but not limited to, heavy metals such as iron, zinc, aluminum, and lead, adversely affect the aquatic environment.

152.    Plaintiff is informed and believes that storm water discharges from the Facility contain pollutants including TSS, pH, N+N, COD, aluminum, lead, iron, and zinc in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

### E.    Defendant's Discharges Via Aerial Deposition

153.    The Facility SWPPP and Facility Map describe and depict large, uncovered, materials storage piles and/or "stock piled materials" (hereafter, the "stockpiles") located in the southeast portion of the Facility. LA Waterkeeper is informed and believes that fugitive dust, debris, particulate, and emissions from the stockpiles are also uncontained and enter local waterways via storm water discharge, unauthorized non-storm water discharge, and aerial deposition. These industrial activities and contaminant factors create significant sources of pollution at the Facility.

154.    Based on LA Waterkeeper's investigation and observations of the Facility, including the results of an aerial deposition study conducted  adjacent to the Facility, Plaintiff is informed and believes that fugitive dust and/or aerially deposited pollutants originating from the Facility's stockpiles fall on the Facility, as well as on others' properties, and in streets and storm drains, immediately adjacent and in close proximity to the Facility. LA Waterkeeper is further informed and believes that fugitive dust / aerial deposition from the Facility is especially high when the Facility operates certain conveyor belt machinery at the Facility. These deposited pollutants are clearly visible to the naked eye and appear as a fine, grey-hued, dust covering sidewalks, roads, cars, storm drains, and buildings on the areas and properties immediately adjacent to the Facility. LA Waterkeeper is informed and believes that during precipitation events, these pollutants are entrained in storm water and discharge MS4 drains around and near the Facility, and ultimately discharge to the San Gabriel River.[6] LA Waterkeeper is also informed and

---

[6] For fugitive dust / aerially deposited material falling on and within the Facility,  LA Waterkeeper is informed and believes that these pollutants are conveyed to the San Gabriel River in the same manner as all storm water runoff as described in the Facility SWPPP.

Complaint for Declaratory and Injunctive        31
and Civil Penalties Relief

believes that the pollutants originating from the Facility's stockpiles are directly discharged, via aerial deposition, into the San Gabriel River which is located directly to the east of the Facility.

155.   LA Waterkeeper is further informed and believes that the fugitive dust / aerially deposited materials originating from the Facility contain significant concentrations of, at minimum, aluminum, iron, and TSS. These pollutants are directly discharged to the San Gabriel River via aerial deposition in violation of the permit and CWA. Once entrained in storm water, furthermore, these pollutants from the Facility, which have been aerially deposited onto the Facility, and surrounding areas, are discharged to MS4, and ultimately to the San Gabriel River, in concentrations exceeding applicable effluent limitations.

**F.    Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements**

156.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

157.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

158.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

159.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

160.   Plaintiff is informed and believes that Defendants have failed and continue

to fail to sample for pollutants, including, but not limited to, aluminum and iron in violation of the Permit where those constituents are present at the Facility and should properly be included in the Facility SWPPP's pollutant source assessment. *See* Storm Water Permit Section XI.B.6.c.

161.    Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

162.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

163.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

164.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

165.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to collect storm water samples during QSEs.

166.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to collect storm water samples from the required number of QSEs.

167.    Information available to Plaintiff is informed and believes, and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

168.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to submit accurate Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

169.   As noted previously, and despite entering ERA Level 1 for pH during the 2021-2022 reporting year, Defendants did not submit a Level 1 ERA report until March 2023. Kelterite's Level 1 report, moreover, is inadequate. The report submitted is in draft form and still contains comments apparently from the QISP that prepared the report, John Gleason. Mr. Gleason notes in multiple locations that the BMPs proposed by the Level 1 ERA report do not appear to address the problem of pH exceedances at the Facility. Accordingly, the Facility Owners/Operators have failed and continue to fail to take Exceedance Response Actions as required by Section XII of the Permit. Every day the Facility operates without submitting and implementing an adequate Level 1 ERA report is a separate and distinct violation of the General Permit and the Clean Water Act. The Facility Owners/Operators have been in daily and continuous violation of the Stormwater Permit Exceedance Response Actions requirements since at least October 1, 2022 (the date the first Level 1 ERA was due). These violations are ongoing, and Waterkeeper will include additional violations when information becomes available. The Facility Owners/Operators are subject to civil penalties for all violations of the Clean Water Act occurring since October 1, 2022.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

170.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

171.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of

BMPs that achieve BAT/BCT.

172.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Sections I(D)(Finding 32)V(A); 33 U.S.C. § 1311(b).

173.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

174.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

175.   Each day, since at least January 12, 2019, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

176.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 12, 2019 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

177.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

178.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

1  hereafter.

## SECOND CAUSE OF ACTION
### Discharges of Non-Storm Water in Violation of
### the Storm Water Permit's Discharge Prohibitions and the Clean Water Act,
### 33 .S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

179.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

180.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators discharged and continue to discharge non-storm water from the Facility in violation of the Storm Water Permit, Discharge Prohibition III(B) each time fugitive dust and/or stored materials, including but not limited to dust generated by wind, conveyors, and trucks, discharge from uncovered materials storage piles and/or stock piled materials at the Facility to the San Gabriel River.

181.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators discharged and continue to discharge non-storm water from the Facility, in violation  of the Storm Water Permit, Discharge Prohibition III(B), each time fugitive dust and/or stored materials is deposited from the materials storage piles and/or stock piled materials at the Facility to storm sewer systems during dry weather from January 12, 2019 through the present.

182.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators' violations of Discharge Prohibition III(B) of the Storm Water Permit are ongoing.

183.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every time non-storm water discharges from the Facility to a water of the United States in violation of Discharge Prohibition III(B) of the Storm Water Permit.

184.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every time non-storm water discharges from

the Facility to a storm sewer system in violation of Discharge Prohibition III(B) of the Storm Water Permit.

185.   Each and every time the Owners/Operators discharge non-storm water from the Facility in violation of Discharge Prohibition III(B) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

186.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 12, 2019 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

187.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

188.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

189.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

190.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to standards set forth in the applicable Basin Plan, has discharged and continues to discharge from the Facility each time storm water

discharges from the Facility.

191.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

192.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

193.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

194.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 12, 2019 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

195.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

196.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

197.  Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

198.  Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

199.  Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

200.  Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

201.  The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from January 12, 2019, to the present.

202.  The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

203.  The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

204.  Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

205.  By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 12, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

206.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

207.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

208.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

209.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

210.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

211.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

212.   The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from January 12, 2019 to the present.

213.   The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

214.   The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

215.   Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

216.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 12, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

217.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

218.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SIXTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water
Permit in Violation of the Storm Water Permit and the
Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

219.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

220.   Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation

of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. Storm Water Permit, Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

221.   The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. *See* Storm Water Permit, Section XX(B).

222.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit.

223.   Further, Defendant have repeatedly failed to submit required ERA Level 2 technical reports and/or action plans, despite entering into and/or remaining in that level for various constituents. As such, Defendant is in daily violation of the Storm Water Permit Section XII.

224.   The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least January 12, 2019.

225.   The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

226.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 12, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

227.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

228.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

229.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

b.   A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.   A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $64,618 per day, as permitted

by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

       d.     A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

       e.     Any other relief as this Court may deem appropriate.

Dated: March 15, 2024           Respectfully submitted,


                             */s/ J. Thomas Brett*
                             Jason R. Flanders
                             J. Thomas Brett
                             AQUA TERRA AERIS LAW GROUP
                             Attorneys for Plaintiff
                             LOS ANGELES WATERKEEPER